UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DUSTIN H. WIECEK,

        Petitioner,

                                      CASE NO. 2:06-CV-12233

v.                              JUDGE ARTHUR J. TARNOW

                                    MAGISTRATE JUDGE PAUL J. KOMIVES

BLAINE C. LAFLER,

        Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
     D.    *Confrontation (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     E.    *Prosecutorial Misconduct (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
               a. Arguing Facts Not in Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
               b. Evidence of Petitioner's Exercise of Rights to Remain Silent and Counsel . . . . . . . 21
               c. Impugning Defense Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
               d. Vouching . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
               e. Shifting Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
     F.    *Judicial Partiality (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     G.    *Sufficiency of the Evidence (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
     H.    *Right to Counsel and Ineffective Assistance of Counsel (Claims III & VI)* . . . . . . . . . . . . . . . 39
          1.    *Denial of Right to Counsel (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
          2.    *Ineffective Assistance of Counsel (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
               a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
               b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
     I.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
III.  NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

_____

    [1]By Order entered this date, Blaine C. Lafler has been substituted for Nick Ludwick as the proper respondent in this action.

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.     <u>REPORT</u>:

A.      *Procedural History*

      1.      Petitioner Dustin H. Wiecek is a state prisoner, currently confined at the Boyer Road Correctional Facility in Carson City, Michigan.

      2.      On October 3, 2002, petitioner was convicted of first degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b(1)(g), following a jury trial in the Wayne County Circuit Court. Petitioner was acquitted of charges that he had poisoned the victim with gamma hydroxybutyrate (GHB) and committed criminal sexual conduct during the course of a felony poisoning. On November 1, 2002, he was sentenced to a term of 27 months' to 15 years' imprisonment.

      3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      PROSECUTORIAL MISCONDUCT DENIED DUE PROCESS OF LAW IN THE FOLLOWING WAYS:

    a.      The prosecutor argued facts not in evidence and misstated a fact.

    b.      The prosecutor elicited evidence of defendant's exercise of his right to remain silent and of his right to counsel and to the effective assistance of counsel and to present a defense.

    c.      The prosecution also vouched for her witness and resorted to bolstering.

    d.      The prosecutor shifted the burden of proof in her opening statement.

II.     THE TRIAL COURT DENIED APPELLANT THE EFFECTIVE ASSISTANCE OF COUNSEL, THE CONSTRUCTIVE RIGHT TO COUNSEL, AND THE RIGHT TO A FAIR TRIAL WHEN IT ORDERED THE DEFENSE NOT TO OBJECT DURING THE PROSECUTION'S

REBUTTAL ARGUMENT.

III.   THE APPELLANT WAS DENIED HIS SIXTH AMENDMENT
CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE AND TO
CONFRONT AND CROSS EXAMINE THE WITNESS AGAINST HIM
WHEN THE PRETRIAL AND THE TRIAL JUDGES DENIED THE
MOTION TO BE ALLOWED TO USE EXCERPTS FROM THE
WITNESS' JOURNAL IN CROSS EXAMINING HER.

IV.   THE TRIAL COURT'S EXAMINATION OF A DEFENSE WITNESS
PIERCED THE VEIL OF JUDICIAL IMPARTIALITY AND INVADED
THE PROVINCE OF THE JURY.

V.   THE TRIAL COURT ERRED WHEN IT ADMITTED HEARSAY
EVIDENCE FROM NON TESTIFYING EXPERTS TO CONFIRM THAT
THE COMPLAINANT HAD INGESTED GHB.

VI.   APPELLANT'S CONVICTION FOR CRIMINAL SEXUAL CONDUCT IN
THE FIRST DEGREE SHOULD BE REVERSED WHERE THE
EVIDENCE WAS INSUFFICIENT TO SUPPORT THE VERDICT
BECAUSE THE PROSECUTION FAILED TO PROVE THE ELEMENT
OF WHETHER DEFENDANT KNEW OR SHOULD HAVE KNOWN
THAT THE COMPLAINANT WAS PHYSICALLY HELPLESS.

VII.   APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF
COUNSEL IN THE FOLLOWING WAYS:

   a.   Trial counsel failed to argue that the complainant's journal excerpts
were admissible under MRE 406 and MRE 404(b) and failed to use
the journal for impeachment purposes once the complainant stated
that acting sexually was not in her character.

   b.   Counsel failed to object to prosecutorial misconduct.

VIII.   APPELLANT WAS DENIED DUE PROCESS OF LAW WHERE EXPERT
TESTIMONY WAS ADMITTED CONCERNING THE CUT OFF LEVEL
FOR DIFFERENTIATING THE ENDOGENOUS GHB FROM
EXOGENOUS GHB IN THE URINE WHERE THERE WAS NO
GENERAL ACCEPTANCE AMONG IMPARTIAL AND
DISINTERESTED EXPERTS IN THE FIELD AS TO WHAT THAT
LEVEL IS AND WHERE THE FOUNDATIONAL REQUIREMENTS
WERE NOT MET.

IX.   MCL 28.721 et seq, THE SEX OFFENDER REGISTRATION ACT, IS

3

UNCONSTITUTIONAL IN THAT IT FAILS TO ALLOW A HEARING ON THE ISSUE WHETHER THE OFFENDER IS A DANGEROUS THREAT TO THE PUBLIC AND IT ALSO VIOLATES APPELLANT'S DUE PROCESS LIBERTY INTEREST.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Wiecek*, No. 247596, 2005 WL 292193 (Mich. Ct. App. Feb. 8, 2005) (per curiam).

4.     Petitioner sought leave to appeal these issues to the Michigan Supreme Court.  The

Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People*

*v. Wiecek*, 474 Mich. 971, 707 N.W.2d 207 (2005).

5.     Petitioner, through counsel, filed the instant application for a writ of habeas corpus

on May 16, 2006.  As grounds for the writ of habeas corpus, he raises six claims:

I.     PETITIONER WAS DENIED HIS RIGHT TO CONFRONT WITNESSES AND PRESENT A DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS BECAUSE HE WAS NOT ALLOWED TO USE EXCERPTS FROM THE COMPLAINANT'S JOURNAL DURING CROSS-EXAMINATION.

II.    PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS DUE TO PROSECUTORIAL MISCONDUCT IN MISREPRESENTING EVIDENCE, ATTACKING THE VERACITY OF DEFENSE COUNSEL, AND COMMENTING ON PETITIONER'S RIGHT TO REMAIN SILENT AND HAVE REPRESENTATION OF COUNSEL.

III.   PETITIONER WAS DENIED HIS RIGHT TO COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT BARRED DEFENSE COUNSEL FROM OBJECTING TO PROSECUTORIAL MISCONDUCT DURING THE PROSECUTOR'S REBUTTAL ARGUMENT.

IV.    THE TRIAL COURT'S EXAMINATION OF A DEFENSE WITNESS PIERCED THE VEIL OF JUDICIAL IMPARTIALITY AND INVADED THE PROVINCE OF THE JURY IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

V.     PETITIONER WAS DENIED DUE PROCESS UNDER THE FIFTH AND

4

FOURTEENTH AMENDMENTS WHERE THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT APPELLANT'S CONVICTION FOR CRIMINAL SEXUAL CONDUCT FIRST DEGREE WHERE THE PROSECUTION FAILED TO PROVE THAT PETITIONER KNEW OR SHOULD HAVE KNOWN THAT THE COMPLAINANT WAS PHYSICALLY HELPLESS.

VI.    PETITIONER WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS BECAUSE TRIAL COUNSEL FAILED TO SEEK ADMISSION OF THE COMPLAINANT'S JOURNAL ENTRIES UNDER MRE 406 AND MRE 404(B) OR FOR IMPEACHMENT PURPOSES AND TRIAL COUNSEL FAILED TO OBJECT TO PROSECUTORIAL MISCONDUCT.

6.    Respondent filed his answer on November 27, 2006. He contends that some of petitioner's claims are barred by petitioner's procedural default in the state courts, and that all of petitioner's claims are without merit.

7.    Petitioner filed a reply to respondent's answer on December 22, 2006.

B.    *Factual Background Underlying Petitioner's Conviction*

The evidence adduced at trial was accurately summarized in petitioner's brief in the Michigan Court of Appeals:

Dustin Wiecek was charged in the information in count I with willfully mingling Gamma Hydroxybutyrate (GHB), a poison or harmful substance, with a drink while he knew or should have known that the drink might be ingested contrary to MCL750.436(1); in count II with criminal sexual conduct in the first degree-during the felony of poisoning contrary to MCL 750.520(b)(l)(c). and in count III with criminal sexual conduct in the first degree, the aggravating factor being that he knew or should have known that the complainant was physically helpless contrary to MCL750.520b(l)(g).

After a jury trial, he was found not guilty of counts I and II and found guilty of count III. He was sentenced to 27 months to 15 years.

The crime was allegedly committed on June 18, 1999 at 45200 Brunswick in the township of Canton. It was not reported until June 19, 1999 and charges were not brought until March 01, 2000. During the motion to bind over the defendant for trial after the preliminary examination, the prosecution stated in regard to Count III that the aggravating factor was causing someone to become physically helpless, causing

personal injury. It cited to *People v Carmichael,* an 1858 case to argue that it had shown the personal injury element of Count III because "When you put someone to sleep with a poison for sexual purposes, that's personal injury." (PET-I 17).

On June 8,2001, the court denied the defendant's motion to be permitted to use excerpts from the complainant's journal in cross examination. (Apx-2a).

On February 26, 2002, a Frye-Davis evidentiary hearing was held pursuant to the defendant's motion challenging the admissibility of the scientific evidence. On March 22, 2002, the court ruled that the evidence would not be suppressed because it found Dr. Jackson, the prosecution's expert, more credible.  "He had greater expertise than the witness produced by the defense." (EHT-II-17).

The court found that the level 0.08 is determinative of it being endogenous–is sufficient to believe that the amount tested in this case would be exogenous . . . . The court also stated that no real evidence was offered to show that the evidence was tampered with or adulterated. The court believed it was reliable and should not be suppressed. (EHT II-19).

The court noted that in regard to the chain of custody that GHB levels can change over a period of time, "It is affected by temperature as well as other factors. And that the affect (sic) is in dispute." But the Court noted that there was testimony as to the chain of custody in which 3 facilities had custody. The court found that that was sufficient and is not determinative of admissibility.  (EHT II-I8).

On September 17,2002, a jury trial began before the Hon. George Crockett, a judge of the Criminal Division of Wayne County Circuit Court. The defense asked for a clarification of the pretrial judge's order excluding the use of evidence from the journal. The trial court stated that the pretrial judge's order stands. (I 7-12).

In her opening statement, the prosecutor stated that Officer Newsome's testimony would show that Mr. Wiecek got the recipe for GHB off the Internet. (I 147-148). She concluded her opening by asking the jurors to listen carefully . . .

> because I don't know what the defendant is going to say, if the defendant gets up here and starts talking about consent, that she consented, and the ability of somebody like that to consent in that sort of helpless state. (II-149).

The complainant, Diana Roddy, testified that she met Dustin Wiecek at Bennigan's where they were both working. They were just friends and not romantically involved. She and Mr. Wiecek had planned to get together at his home during the day on June 18 because she had just completed school and it was right before Mr. Wiecek would be starting summer school. Their plan was to get drunk (III-40) and enjoy the Wiecek hot tub in the backyard.

She arrived at the house at about 11:00 am. They started drinking rum and beer. She was feeling slightly intoxicated. (1I-1 77). Mr. Wiecek then brought out a glass of wine. After Mr. Wiecek brought out a glass of wine to the tub she stated that she " . . . wasn't aroused toward the defendant, Mr. Wiecck, but I began to act in a way that was, it could only be described as sexual. It wasn't in my character to normally behave that way." (I-178).

She removed the bottom of her bathing suit and let the hot tub water jet strike

her inner legs and vaginal area. (III-63). She was within a foot of the jet. (II-179). That was the last thing she remembered until the defendant woke her. She was on his bed wearing her own flannel pants but a shirt that belonged to Mr. Wiecek. She felt groggy but not hung over. Mr. Wiecek then told her he had lost his virginity to her. He admitted that he had trouble keeping it in and had to stop because she was making noise, but that she seemed to be enjoying it. She had no recollection of what he was talking about. (II 179-182). She testified that he was surprised that she could not remember the sex. (III-84). She estimated that she was unconscious for three hours, from 1-4:00pm. She had bruises on her legs and upper arms, and her lower back was sore. (II-187). She felt confused and disturbed.  (II-188).

The witness admitted that she had had prior experiences drinking and being in a hot tub. (II-174). Before that date she had not heard of GHB. (II-176).

She testified that Mr. Wiecek called her that night and said it had been a mistake and it was because they were drunk. (III-5). He also told her that she had lost control of her bowels in the hot tub and that he had to put her in the shower and then dress her. (III-7).

The next day she was emotionally shook up, she had bruises, and her friend Amber Jbara suggested she see a doctor. She drove the complainant to Oakwood Hospital. (III 11-13).

She testified that Mr. Wiecck did not understand why she went to hospital. (III-19).

She agreed that after she woke up she felt disoriented, dizzy, and fatigued. (III 112-114).

During the voir dire concerning the urine sample collected from the complainant, Dr. Weaver testified that it was sent to Qwest Laboratory. He also admitted that Oakwood Hospital did not use the kind of chain of custody for instance that the federal government might mandate. It used the chain of custody that is used for routine medical care. There was no chain of custody policy for obtaining samples involving these type of cases or any other cases in the emergency room. (III 135-136, 137).

Amber Jbara, the complainant's best friend, testified to her conversation with the complainant about what happened to her. When the witness told appellant that she saw the bruises, he seemed surprised. (V-6) During her testimony, the prosecution asked the following:

Q. So when Mr. Callanan asked you these complicated questions trying to confuse the record, I just want it to be clear for the jury. . .
.

(V-27).

During the prosecution's recross of Dr. Eisenga, the following was asked:
Q. So you have added opinions as this case has progressed and the Defense has requested that you come up with more opinions, you've added opinion in this case, such to come up with an explanation as to what happened to Ms. Roddy?
A. I have reassessed the case certainly.

The prosecution then asked how much the witness was paid. (VII 69).

Police Officer Bruce Roderick testified that he had not heard of GHB in 1999. (VII-85). Sgt. Newsome testified that Officer Schreiner said to her in regard to interviewing the defendant ". . . And he lawyered up, you can't talk to him." (VII 105). When asked if she tried to get the liquor containers from the Wiecek home, she answered no because he had a lawyer and had invoked his Fifth Amendment right. (VII 114-115).

Officer Newsome discovered that the FBI was not conducting tests for GHB because it was not a federally regulated drug. (VII 112). Canton Police Department had no protocol in place concerning GHB and there was no law enforcement testing of blood and urine for date rape drugs. (VII 150).

She also testified that the Wiecek's family computer was removed pursuant to the execution of a search warrant. But there was no evidence on the computer to show he had looked up anything on GHB. (VII-132).

This witness explained that an assistant prosecuting attorney had told her to have the complainant call Mr. Wiecck up and see if she could get him to make admissions on the phone but he would not talk. (VII 129-131).

On redirect, the prosecutor asked a burden shifting question. (VII-173). She also asked questions concerning the attorney's pre-arrest efforts to get the case dismissed. (VII-I 75). She testified that information from the defendant's school was used to finally get the warrant. (VII-I77).

Trial counsel cross examined the witness on the defendant's use of an attorney. The trial judge had to stop the questioning. (VII 133-134).

During the direct examination of Catherine Zeni, the prosecution brought out that the defendant and his parents came to her house to help in getting an attorney. (VIII 38-39).

On September 30, 2002 after the prosecution rested, the defense moved for a directed verdict. (IX 33-38). The defense continued to argue that the scientific evidence offered by the prosecution was inadequate and noted that articles in scientific journals acknowledged by both Dr. Jackson and Ms. Pearson reported that endogenous levels of GHB in the urine can be as high as 6.5 micrograms. (IX-36). The motion was denied. (IX-42).

The defendant did not testify and the defense rested. The motion for directed verdict was renewed and the court again denied it. (XI 44-45).

Appellant's Br. on Appeal, in *People v. Wiecek*, No. 247596 (Mich. Ct. App.), at 1-6

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539

U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Confrontation (Claim I)*

Petitioner first contends that he was denied his Sixth Amendment right to confront the

witnesses against him when he was prohibited from questioning the victim concerning a poem she had written.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

      1.    *Clearly Established Law*

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI. The Confrontation Clause is applicable to the states through the 14th Amendment's Due Process Clause.  *Pointer v. Texas*, 480 U.S. 400, 406 (1965).  The Supreme Court's "Confrontation Clause cases fall into two broad categories:  cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (per curiam).  The latter category, which is implicated in petitioner's claims, recognizes that "[c]onfrontation means more than being allowed to confront the witness physically."  *Davis v. Alaska*, 415 U.S. 308, 315 (1974).  Thus, in cases where the trial court has restricted cross-examination in some manner, "the Court has recognized that Confrontation Clause questions will arise because such restrictions may 'effectively . . . emasculate the right of cross-examination itself.'"  *Fensterer*, 474 U.S. at 19 (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

However, the Supreme Court has also explained that the Confrontation Clause does not "guarantee cross-examination that is effective in whatever way and to whatever extent the defense might wish."  *Fensterer*, 474 U.S. at 20.  The question is whether the trial court's ruling allowed for "substantial compliance with the purposes behind the confrontation requirement," or, put another way, whether petitioner was "significantly limited in any way in the scope or nature of his cross-examination."  *Green*, 399 U.S. at 166.  Thus, "[s]o long as cross-examination elicits adequate

information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth

Amendment is not compromised by a limitation on cross-examination." *United States v. Cueto*, 151

F.3d 620, 638 (7th Cir. 1998); *see also*, *United States v. Larranaga*, 787 F.2d 489, 498 (10th Cir.

1986).

　　2.　　*Analysis*

　　Petitioner's claim focuses on the trial court's exclusion of the victim's journal, which was

found in petitioner's house on the day following the sexual assault.  The journal contained a poem

describing an alcoholic blackout:

| | |
|---|---|
| I woke up confused | with somebody else's |
| I woke up drunk | clothes on and no bra |
| I woke up and hit my head | I didn't think this |
| on my nightstand | would happen again |
| Wait a second | Drinking is just for |
| that's not my nightstand | those who have nothing else |
| Where the hell am I. | to do |
| And who's that sleeping | I guess I did plenty |
| next to me? | and   now   I   [k]now   whom |
| I better run | [illegible] |
| I better hide | Knocking at the window |
| 'cause I don't know | told me I wasn't allowed |
| What I did last night | to be here anymore |
| . . . | So I went inside |
| I woke up confused | and ended up naked again |
| I didn't know where I was | At least it was |
| except that I had | a familiar face this time |
| gone to an apartment complex | At least I know his last name |
| Too bad I woke up | I guess that makes it okay |
| in a car | to do it again. |

Br. in Supp. of Pet., Ex. 6.

　　At trial, part of petitioner's theory was that the victim was not unconscious and physically

helpless, but had experienced an alcoholic blackout.  In support of this theory, petitioner presented

Dr. Bernard Eisenga as an expert witness.  Dr. Eisenga testified that people suffering from an

12

alcoholic blackout "may appear to be awake and coherent but, in reality, they are not," and that such people "basically have an amnesic period of time where they don't remember what's going on. They may appear to be functioning normally, but they are not." Trial Tr., dated 9/26/02, at 31-32. On cross-examination of the victim, counsel elicited from her that she had not had an alcoholic blackout prior to the date of the sexual assault, but that she had had subsequent blackouts. *See* Trial Tr., dated 9/19/02, at 43-44. Prior to trial, however, the court had ruled at a preliminary hearing that the poem from the journal was not admissible as character evidence under Rule 404(a), and that introduction of the poem was barred by the rape shield statute, MICH. COMP. LAWS § 750.520j. *See* Def.'s Br. on App., Ex. 2a; Trial Tr., dated 9/17/02, at 7-12.

On appeal, the Michigan Court of Appeals rejected petitioner's claims that this evidence was improperly excluded and that the exclusion of the evidence violated petitioner's right to confront the victim. The court concluded that the poem "was not admissible for the purpose of proving the victim's character under MRE 404(a)(2), as in effect at that time, because the rule expressly precluded such evidence in a prosecution for criminal sexual conduct." *Wiecek*, 2005 WL 292193, at *5, slip op. at 5. The court also held that exclusion of the evidence pursuant to the rape shield statute did not violate petitioner's right to confront the victim because the sexual conduct described in the poem was not relevant. With respect to consent and physical helplessness, the court reasoned that the poem was undated and may have described a fictional event. Further, even if the poem described actual events, "the evidence had little or no relevancy to the issue of the victim's consent with defendant with regard to the charged incident." *Id*. at *6, slip op. at 6. The court also rejected petitioner's argument that the poem was relevant to the victim's motive to testify as she did. The court explained that petitioner argued that the victim did not claim that a sexual assault had occurred

until she had been informed by the examining doctor that she had been subjected to GHB poisoning, and that the victim had grasped this as her excuse rather than face her drinking problem. "However," the court explained, "nothing in the journal excerpts tends to establish or make more likely than not this theory of motive, and therefore the exclusion of the journal excerpts neither abridged defendant's right of confrontation, nor constituted an abuse of discretion by the trial court." *Id*. Although this issue presents a close question, the court of appeals's determination was not an unreasonable application of clearly established federal law, and thus the Court should conclude that petitioner is not entitled to habeas relief on this claim.

"Like most States, Michigan has a 'rape-shield' statute designed to protect victims of rape from being exposed at trial to harassing or irrelevant questions concerning their past sexual behavior." *Michigan v. Lucas*, 500 U.S. 145, 146 (1991). Michigan's rape shield law provides:

> Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under sections 520b to 520g [the sexual conduct offense provisions] unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
> (a) evidence of the victim's past sexual conduct with the actor;
> (b) evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.

MICH. COMP. LAWS § 750.520j(1). The statute further provides that, if a defendant seeks to introduce evidence under (a) or (b), he must give notice of his intent to do so within ten days of the arraignment. *See id*. § 750.520j(2).

In support of his claim, petitioner relies principally upon the Supreme Court's decision in *Davis v. Alaska*, *supra*. In that case, the Court held that the Sixth Amendment right to confront witnesses guarantees a criminal defendant the right to cross-examine adverse witnesses to expose

bias and motivations for testifying.  *See id.* at 315-16; *see also*, *Delaware v. Van Arsdall*, 475 U.S. 673, 678-80 (1986).  However, the *Davis* Court limited its Confrontation Clause decision to those facts going to a witness's bias or motive in testifying, as opposed to general attacks on credibility. The Court's decision in *Van Arsdall* was similarly limited.  Indeed, in his concurring opinion in *Davis*, Justice Stewart emphasized that the *Davis* "Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination" concerning past convictions.  *Davis*, 415 U.S. at 321 (Stewart, J., concurring).

Thus, there is no clearly established federal law as determined by the Supreme Court, within the meaning of § 2254(d)(1), which establishes a criminal defendant's right to cross-examine a witness to expose issues relating to general credibility, as opposed to bias and motives for testifying. As the Sixth Circuit has explained:

> although *Davis* trumpets the vital role cross-examination can play in casting doubt on a witness's credibility, not all conceivable methods of undermining credibility are constitutionally guaranteed.  In particular, the *Davis* Court distinguished between a "general attack" on the credibility of a witness–in which the cross-examiner "intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony"–and a more particular attack on credibility "directed toward revealing possible biases, prejudices, or ulterior motives as they may relate directly to issues or personalities in the case at hand."

*Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000) (quoting *Davis*, 415 U.S. at 316).  The Court in *Davis* found only the latter, particularized attack on bias and motivation, to be a protected aspect of the right to confrontation.  *See Boggs*, 226 F.3d at 737.  As the Sixth Circuit explained in *Boggs*, "[c]ourts after *Davis* and *Van Arsdall* have adhered to the distinction drawn by those cases and by Justice Stewart in his concurrence–that cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not."  *Boggs*, 226 F.3d

at 737; *see also*, *Quinn v. Haynes*, 234 F.3d 837, 844-45 (4th Cir. 2000); *Reiger v. Christensen*, 789 F.2d 1425, 1433 (9th Cir. 1986).

Here, there is no question that the area of cross-examination which counsel for petitioner sought to explore went to general credibility, rather than to a bias or motive for testifying. Petitioner argues that the evidence would have shown, contrary to her trial testimony, that the victim had suffered previous alcohol induced blackouts. Although petitioner attempts to argue that the poem would implicate the victim's motive to testify, nothing in the poem speaks to her motive in any way. Rather, the poem merely describes an instance of sexual activity following an alcoholic blackout. It does not shed light on why the victim testified as she did in petitioner's case. Thus, under *Boggs*, this restriction on cross-examination did not infringe on petitioner's Sixth Amendment confrontation rights. It matters not that the credibility of these witnesses was central to the prosecution's case:

> No matter how central an accuser's credibility is to a case . . . the Constitution does not *require* that a defendant be given the opportunity to wage a general attack on credibility by pointing to individual instances of past conduct. In other words, [petitioner]'s argument that credibility is crucial to this case, and that therefore any evidence bearing on credibility must be allowed in, simply does not reflect Sixth Amendment caselaw. Under *Davis* and its progeny, the Sixth Amendment only compels cross-examination if that examination aims to reveal the motive, bias or prejudice of a witness/accuser.

*Boggs*, 226 F.3d at 740 (emphasis in original).[2]

---

[2]Petitioner relies primarily on *Davis* and *Van Arsdall* in support of his claim. I have explained above why these cases do not support petitioner's claim for relief. Petitioner also relies heavily on two other cases, *Alford v. United States*, 282 U.S. 687 (1931) and *Olden v. Kentucky*, 488 U.S. 227 (1988). Neither of these cases supports petitioner's confrontation claims. Both of these cases were bias/motive cases, not general credibility cases. *See Alford*, 282 U.S. at 693; *Olden*, 488 U.S. at 231-32. The Supreme Court has repeatedly described *Alford* as a bias/motive case. *See Davis*, 415 U.S. at 317-18; *United States v. Abel*, 469 U.S. 45, 49 (1984). And, although the Supreme Court has not cited *Olden* since that case was decided, the federal courts of appeals likewise describe *Olden* as a bias/motive case. *See Boggs*, 237 F.3d at 737; *Quinn*, 234 F.3d at 844. Thus, for the same reasons that *Davis* and *Van Arsdall* do not support petitioner's claims, *Alford* and *Olden* likewise provide petitioner with no basis for habeas relief.

In support of his claim, petitioner relies extensively on the Sixth Circuit's decision in *Lewis v. Wilkinson*, 307 F.3d 413 (6th Cir. 2002). However, *Lewis* is distinguishable because it is a case involving evidence of the victim's motive to testify. In *Lewis*, the petitioner sought to introduce several statements from the victim's journal. The trial court prohibited cross-examination regarding one journal entry in which the victim wrote:

> I can't believe the trial's only a week away. I feel guilty (sort of) for trying to get Nate locked up, but his lack of respect for women is terrible. I remember how disrespectful he always was to all of us girls in the courtyard . . . he thinks females are a bunch of sex objects! And he's such a player! He was trying to get with Holly and me, and all the while he had a girlfriend. I think I pounced on Nate because he was the last straw. That, and because I've always seemed to need some drama in my life. Otherwise I get bored. That definitely needs to change. I'm sick of men taking advantage of me . . . and I'm sick of myself for giving in to them. I'm not a nympho like all those guys think. I'm just not strong enough to say no to them. I'm tired of being a whore. This is where it ends.

*Lewis*, 307 F.3d at 417. The Sixth Circuit concluded that the trial court's ruling prohibiting the petitioner from cross-examining the victim regarding this journal entry was an unreasonable application of *Davis* because the journal entry went to the victim's motive in testifying. The court explained:

> In this court's view, the excluded excerpts are evidence of consent and motive, as argued by appellant. For example, the excluded statements: "I'm just not strong enough to say no to them" and "this is where it ends", when read together with the admitted statements: "I'm sick of men taking advantage of me" and "I think I pounced on Nate because he was the last straw," could reasonably be read as Heaslet pursuing rape charges against Lewis as a way of taking a stand against all the men who previously took advantage of her. The excluded statement: "I'm just not strong enough to say no to them" may be construed as evidence that Heaslet consented to have intercourse with Lewis. The trial court concluded that the references to "them" in the excluded statements, as opposed to the specific references to "Nate" used previously in the same diary entry, render the later statements generic, misleading, and ambiguous. However, this court believes the statements can reasonably be taken to infer consent and motive, and should have been given to the jury to make the ultimate determination.

*Id.* at 420-21.

Here, unlike in *Lewis*, the poem with which petitioner sought to cross-examine the victim did not provide any evidence of either consent or her motive to testify.  With respect to consent, in *Lewis* there was a fair inference that the statements implying consent referenced the specific sexual incident for which the petitioner in that case was charged.  Here, on the contrary, it is undisputed that the poem, even if describing an actual event, described an event prior to the sexual assault for which  petitioner was charged.  Further, the poem does not provide any indication of consent.  It describes what appears to be a sexual encounter following either an alcoholic blackout or unconsciousness.  The poem is equally indicative of a prior sexual assault based on the victim's physical incapacitation as it is of consensual sex, and in any event it does not in any way relate to the incident involving petitioner.  As to motive, in *Lewis* the statements–particularly that the victim had "pounced" on the petitioner and was "sick of men taking advantage of me"–suggested that the victim was "pursuing rape charges against Lewis as a way of taking a stand against all the men who previously took advantage of her."  *Lewis*, 307 F.3d at 421.  Here, on the contrary, nothing in the poem suggests that the victim "grasped" at the GHB poisoning to avoid confronting her own drinking problems.  To be sure the poem, if describing an actual event, provides evidence that the victim had a drinking problem which caused her to black out and/or engage in sexual activity.  However, nothing in the poem, either standing alone or in conjunction with the other evidence in the case, suggests any motive on the part of the victim to "run" from her alcohol problem by falsely accusing petitioner.  And, in any event, even if there are some similarities between this case and *Lewis*, the dissimilarities between the journal entry in *Lewis* and the poem in this case are great enough that it cannot be said that the court of appeals's determination that the poem did not go to

18

consent or motive was unreasonable.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.     *Prosecutorial Misconduct (Claim II)*

Petitioner next contends that he was denied a fair trial by several instances of prosecutorial misconduct.  Specifically, he contends that the prosecutor committed misconduct by: (1) arguing facts not in evidence; (2) eliciting evidence of petitioner's exercise of his rights to remain silent and to counsel; (3) impugning defense counsel; (4) vouching for the credibility of witnesses; and (5) shifting the burden of proof to petitioner.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused."  *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted).  In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and

persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

    2.    *Analysis*

        *a.  Arguing Facts Not in Evidence*

Petitioner first argues that the prosecutor argued facts not in evidence when characterizing Dr. Eisinga's testimony regarding the cause of the victim's loss of bowel control. The prosecution's expert testified that the loss of bowel control could only be explained by the victim having ingested GHB. Petitioner countered with the testimony of Dr. Eisinga, who testified that a person drinking alcohol and sitting in a hot tub could suffer a vasovagal response, or "hysterical fainting," which could cause a loss of bowel control. *See* Trial Tr., dated 9/26/02, at 27-28. He also testified that overconsumption of alcohol alone could cause a loss of bowel control. *See id.* at 30. On cross-examination, he admitted that loss of bowel control due to alcohol consumption was not common, but that he had "seen it happen." *Id.* at 50-51. During her closing argument, the prosecutor stated: "You heard estimates on the witness stand by some of the experts, it's possible it happened like that. Have you seen one case where that's happened? Eisinga, for example, about losing bowel control. It's not possible." *Id.*, dated 9/30/02, at 94.

Although the prosecutor undoubtedly mischaracterized Dr. Eisinga's testimony concerning the loss of bowel control, petitioner cannot show that he was denied a fair trial by this comment. The relationship between the loss of bowel control and alcohol consumption was relevant to the charges involving the GHB. The prosecutor, through her witnesses and during summation, went to great lengths to attempt to show that the loss of bowel control was indicative solely of GHB poisoning. Petitioner countered with expert testimony and argument that overconsumption of alcohol could cause loss of bowel control. Petitioner, however, was acquitted on the two charges

relating to GHB poisoning.  With respect to the charge on which petitioner was convicted–sexual penetration of a physically helpless victim–it was the fact of the loss of bowel control which was relevant to whether the victim was physically helpless regardless of whether the loss of bowel control resulted from GHB or alcohol poisoning.  There was no dispute as to the fact that the victim had lost control of her bowel in the hot tub.  Because the cause of that loss of bowel control was irrelevant to the charge for which petitioner was convicted, petitioner cannot show that the comment deprived him of a fair trial.  At a minimum, he cannot show that the Michigan Court of Appeals's conclusion based on this reasoning, *see Wiecek*, 2005 WL 292193, at *2, slip op. at 2, was unreasonable.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Evidence of Petitioner's Exercise of Rights to Remain Silent and Counsel

Petitioner next contends that he was denied a fair trial because the prosecutor elicited from witnesses that petitioner had invoked his rights to remain silent and to counsel.  In support of petitioner's claim, he points to several incidents at trial:

- The prosecutor asked the first police officer on the case, David Schreiner, whether he had attempted to interview petitioner.  Schreiner testified that he had left messages for petitioner, but had not spoken to him.  *See* Trial Tr., dated 9/26/02, at 94.  On cross-examination, defense counsel asked Schreiner if he had gotten a call from defense counsel giving notice that he was representing petitioner, and Schreiner indicated that when a person is represented, any further contact would occur through counsel.  *See id*. at 101.  On redirect, the prosecutor asked: "[Defense counsel] never showed up with his client for you to interview, did he?"  *Id*.  Defense counsel objected to the question, and the objection was sustained.  *See id*. at 102.

- During the questioning of Officer Newsome, the prosecutor asked: "Do you recall the first time you found out about the Diane Roddy case?"  *Id*. at 104.  Newsome indicated that she got the case from Schreiner, and that "[t]he only thing I remember him saying, basically, about this case initially was, [h]ere's a CSC.  The victim doesn't recall anything; you know, can't remember

21

anything about the rape. And he lawyered up, you can't talk to him. And she was unsure whether or not she wanted to prosecute, and we're waiting on a rape test kit." *Id*. at 105.

- Later during the questioning of Newsome, the prosecutor asked if she had tried to obtain any containers from the home. *See id*. at 114. Newsome responded: "Ma'am, by the time I got this he had already obtained defense counsel. He invoked his Fifth Amendment right. I don't mean to infer anything by that, that was perfectly fine. He didn't want to speak with us." *Id*. at 115.[3]

- Again during Newsome's testimony, the prosecutor asked a series of questions relating to Newsome's attempt to obtain a warrant and to have the victim phone petitioner to elicit an incriminating statement. *See id*. at 129. Newsome testified that this idea originated with a special prosecutor from whom she sought a warrant. The prosecutor then asked: "Pursuant to her instructions then, you did what?" *Id*. Newsome responded: "There was some conversation between ourselves, obviously. She got involved and she started doing some investigation as well, interviewed Diana and called most of the people that I had as experts. She was questioning as to why, you know, we had not questioned or attempted to talk to Dustin, Mr. Wiecek, even with his attorney present. I just told her that, you know, I know he's a very competent attorney. I think it would be a total waste of my time. I didn't feel comfortable doing that." *Id*. at 130.

- During cross-examination of defense witness Catherine Zeni, petitioner's neighbor, the prosecutor asked whether petitioner and his mother had asked for Zeni's help in obtaining a lawyer, and whether Zeni had given them the name of a lawyer. Zeni responded that she had. *See id*. at 38-39. Zeni agreed that she had done so because her son was a friend of petitioner, and because she did not want to see anything bad happen to petitioner. *See id*. at 39.

Petitioner contends that these statements from the witnesses amounted to improper comments on his right to remain silent and to counsel. The Michigan Court of Appeals, reviewing the claim for plain error because petitioner had failed to object at trial, rejected petitioner's claim. The court

---

[3]Both the court of appeals and petitioner here identify this comment as coming during cross-examination. The transcript, however, indicates that it occurred during the prosecutor's direct examination. The September 26, 2002, transcript indicates that defense counsel's cross-examination begins at page 132.

22

concluded that Newsome's comment that petitioner had "lawyered up" was not plain error because there was "no indication that the challenged testimony was anticipated by the prosecutor," and because "the context of the remark was not intended to suggest that defendant was guilty because he had obtained a lawyer." *Wiecek*, 2005 WL 292193, at *2, slip op. at 3. The court of appeals found that the second comment by Newsome did not amount to prosecutorial misconduct because it was elicited by defense counsel. *See id*. at *3, slip op. at 3. The court found no plain error in Newsome's third comment because "[t]he testimony was elicited in the context of explaining why the police contemplated attempting a pretext phone call to defendant by the victim. Viewed in context, there was no attempt to suggest that defendant's exercise of either his right to silence or his right to counsel implied he was guilty." *Id*. Finally, the court found no plain error in the questions to Zeni, because "the testimony was relevant to the issue of Zeni's bias toward defendant and her credibility as a witness and did not amount to plain error." *Id*.

Certainly, some of the comments identified by petitioner were less than ideal, and were this Court an appellate court with supervisory powers over the trial court petitioner's claim would arguably be deserving of relief. The question here, however, is whether the court of appeals's rejection of petitioner's claim was an unreasonable, rather than simply incorrect, application of clearly established federal law. The Court should conclude that the court of appeals's decision was reasonable, and thus that petitioner is not entitled to habeas relief on this claim.

While a prosecutor must refrain from suggesting to the jury that a defendant hired an attorney to generate an alibi or get his "story straight," *Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir. 1990), habeas relief is not appropriate where the prosecutor's comment or a witness's testimony offers no suggestion that the petitioner's hiring of an attorney establishes his or her guilt. *See Ridley*

*v. Walter*, No. 99-35240, 1999 WL 1040089, at *1 (9th Cir. Nov. 5, 1999). Here, neither the witnesses nor the prosecutor explicitly or implicitly suggested that petitioner was guilty because he had hired an attorney. Rather, the statements from Newsome were made to explain why she did or did not do certain things, an issue which was relevant in light of counsel's suggestion throughout the case that the police had not properly investigated the matter. Further, Newsome explicitly stated that she did not mean to imply anything by noting that petitioner had retained counsel. Similarly, the questions to Ms. Zeni were relevant to show that she had a close relationship with petitioner and his mother, and thus that she was biased in petitioner's favor. Viewed in context, it was reasonable for the court of appeals to conclude that these statements from the witnesses did not suggest that petitioner was guilty because he had hired an attorney, and the court's rejection of petitioner's claim was therefore a reasonable application of federal law. *See United States v. Tocco*, 200 F.3d 401, 422-23 (6th Cir. 2000) (brief introduction of evidence that defendant had consulted an attorney did not warrant reversal because "the mere act of hiring an attorney is simply not probative of [the defendant's] guilt or innocence under the circumstances."); *Noland v. French*, 134 F.3d 208, 216 (4th Cir. 1998) (habeas relief not warranted where prosecutor's comment on petitioner's invocation of his *Miranda* rights was used only to show the timing of certain events, not to suggest that petitioner was guilty of the crimes charged); *Fellman v. Poole*, No. C 90-20007, 1993 WL 248693, at *3 (N.D. Cal. June 28, 1993), *aff'd*, 33 F.3d 58 (9th Cir. 1994) (habeas relief not warranted based on prosecutor's reference to petitioner's hiring of an attorney where prosecutor "never equated or insinuated that Petitioner's use of counsel showed his guilt."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. *Impugning Defense Counsel*

Petitioner next argues that the prosecutor improperly impugned his defense counsel and expert witness. During questioning of the victim's friend, Amber Jbara, the prosecutor prefaced a question: "So when [counsel] asked you those complicated questions trying to confuse the record, I just want it to be clear for this jury as to what is in your statement and what Ms. Roddy told you . . . ." Trial Tr., dated 9/23/02, at 27. On cross-examination of petitioner's expert, the prosecutor suggested that the expert had changed his opinions: "So you have added opinions as this case has progressed and the Defense has requested that you come up with more opinions, you've added opinions in this case, such to come up with an explanation as to what happened to Ms. Roddy?" *Id.*, dated 9/26/02, at 69. Dr. Eisenga responded: "I have reassessed the case, certainly," and explained that he had done so in light of new facts which were brought to light and developments in the science involved as reflected in scientific literature. *See id.* During rebuttal, the prosecutor argued that defense counsel had attempted to put the victim on trial and had "crossed the line" by questioning the victim regarding the death of her mother. *See id.*, dated 9/30/02, at 128-29. Also during rebuttal, the prosecutor responded to defense counsel's argument that the police had inadequately investigated the case:

> So what's lacking that he points to? You know, we didn't go get the clothes. You know what? He was lucky, maybe, Mr. Wiecek, in some respects, this happened on a Friday night. She went to the hospital Saturday. You heard testimony that the detectives work half a day on Saturday and, unfortunately, something happened, the road sergeant, somebody didn't notify the detective on duty, he didn't get it until Monday. Sunday night Mr. Wiecek has a lawyer. So that's what happened as far as the sequence of what happened.

*Id.* at 132.

Petitioner cannot show that he was denied a fair trial by these comments. The question to the victim's friend was part of a permissible attempt by the prosecutor "to clarify Jbara's testimony

regarding whether the victim told her that defendant had sex with her while she was unconscious." *Wiecek*, 2005 WL 292193, at *3, slip op. at 4. The prosecutor's question to Dr. Eisenga was appropriate in light of Dr. Eisenga's testimony regarding the evolution of his opinion in the case, and in any event Dr. Eisenga explained the basis for the development of his opinion. The prosecutor's comment that defense counsel had crossed the line by questioning the victim about the death of her mother was part of a broader, legitimate argument that this was simply irrelevant to the case. Finally, the prosecutor's comment describing petitioner's "luck" that the assault had occurred on a Friday night was a fair response to defense counsel's assertion that the police had not properly investigated the matter. *Cf. United States v. Emenogha*, 1 F.3d 473, 481 (7th Cir. 1993) (trial was not fundamentally unfair where prosecutor disparaged defense counsel by stating: "Now, Ms. Carotheres went on at length about the evidence the government presented where there were no tapes of this, no videotapes of that, no da da da da, da da da. Well, can you imagine if we left the investigation of this case to a criminal defense attorney what kind of evidence we would have?"); *cf. Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (one factor in evaluating claims of prosecutorial misconduct is whether the prosecutor's statement was "invited by or was responsive to the [argument] of the defense."). Accordingly, the Court should conclude that petitioner is not entitled to relief on this claim.

### d. Vouching

Petitioner also argues that the prosecutor improperly vouched for the victim when she rebutted defense counsel's assertion that the victim had touched petitioner in the hot tub by stating that the victim denied any sexual contact: "That has been her testimony at the exam, throughout these proceedings, and on this stand. She's never had sexual contact." Trial Tr., dated 9/30/02, at

136.  Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury."  *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[4]  The prosecutor's comment did not express a personal belief in the victim's credibility; rather, the prosecutor suggested that the victim was credible because her story had not changed over time.  Nor did the prosecutor suggest that facts not in front of the jury supported the victim's testimony.  While it is true that the transcript of the preliminary examination testimony was not in front of the jury, defense counsel did impeach the victim with her testimony from the preliminary examination, in which she stated that there may have been "contact" because the hot tub was small, but the victim also testified in response to this impeachment that she did not mean there had been any sexual contact.  *See* Trial Tr., dated 9/19/02, at 67-71.  Thus, the prosecutor's comment was a fair inference from the victim's testimony at trial, particularly the victim's testimony in response to defense counsel's impeachment of her.

Petitioner also argues that the prosecutor vouched for her case by eliciting from Newsome that the prosecutor's office had approved a search warrant and that a magistrate had determined that there was probable cause to issue the warrant.  *See* Trial Tr., dated 9/26/02, at 175-77.  However, this exchange occurred in response to defense counsel's cross-examination of Newsome, in which he elicited or attempted to elicit from Newsome that there had been some discussion with the

---

[4]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering."  *See Francis*, 170 F.3d at 551.

prosecutor's office about dropping the case, and that the search had been improperly conducted. *See id*. at 165-68. The questions were thus a fair response to counsel's insinuation that the police had acted improperly. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

#### e. Shifting Burden of Proof

Finally, petitioner contends that the prosecutor impermissible shifted the burden of proof by stating, during opening argument: "[A]nd listen carefully, because I don't know what the defendant is going to say, if the defendant gets up here and starts talking about consent, that she consented, and the ability of somebody like that to consent in that sort of helpless state." Trial Tr., dated 9/18/02, at 149. Petitioner contends that this statement shifted the burden of proof to him on the issue of consent. However, nothing in the statement suggests that petitioner had any obligation to come forward with any evidence of consent, or that petitioner bore the burden of proving that the defendant had consented. Rather, the prosecutor merely asked the jury to listen carefully to any evidence of consent which petitioner might offer, and to consider that evidence in light of the evidence of the victim's physical helplessness. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### F.   Judicial Partiality (Claim IV)

Petitioner next contends that he was denied a fair trial because the trial judge pierced the veil of impartiality during his questioning of a defense witness. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

#### 1.   Clearly Established Law

Perhaps "[n]o right is more fundamental to the notion of a fair trial than the right to an

impartial judge." *Bracy v. Gramley*, 81 F.3d 684, 696 (7th Cir. 1996) (Rovner, J., dissenting), *rev'd*, 520 U.S. 899 (1997); *see also*, MASS. CONST. of 1780, pt. 1, art. 29. Thus, "the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy*, 520 U.S. at 904-05 (citation omitted) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). "Because judicial bias infects the entire trial process it is not subject to harmless error review." *Maurino v. Johnson*, 210 F.3d 638, 645 (6th Cir. 2000) (citing *Chapman v. California*, 386 U.S. 18, 23 & n. 8 (1966)); *see also*, *Rose v. Clark*, 478 U.S. 570, 577 (1986) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)).

Habeas relief on the basis of judicial bias is appropriate only if "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). As a general matter, habeas relief will be appropriate only upon a showing that the trial judge was actually biased or prejudiced against the petitioner. *See Fero v. Kerby*, 39 F.3d 1462, 1478 (10th Cir. 1994). However, in exceptional circumstances "the likelihood of bias or appearance of bias can, in certain circumstances, be so substantial as to create a conclusive presumption of actual bias." *Id.* (internal quotation omitted). The appearance of bias situation is limited to cases in which "a judge is faced with circumstances that present some actual incentive to find one way or the other[,]" *id.* (internal quotation omitted); *see also*, *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc), such as where the judge has a pecuniary interest in the outcome or has been the target of repeated abuse by one of the parties. *See Six v. Delo*, 885 F. Supp. 1265, 1271 (E.D. Mo. 1995), *aff'd*, 94 F.3d 469, 478 (8th Cir. 1996).

As the Supreme Court has noted in the context of the federal recusal statute, "[t]he alleged

29

bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *see also*, *Liteky v. United States*, 510 U.S. 540, 549-51 (1994); *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988).  For this reason,

> judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.   In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved.

*Liteky*, 510 U.S. at 555.   Thus, "[a] judge's ordinary efforts at courtroom administration–even a stern and short-tempered judge's ordinary efforts at courtroom administration–remain immune." *Id*. at 556.  Although *Liteky* was decided on the basis of the federal recusal statute, it provides guidance for resolving habeas claims of judicial bias.  *See Maurino*, 210 F.3d at 645; *Poland v. Stewart*, 117 F.3d 1094, 1103-04 (9th Cir. 1997).

Apart from judicial comments which show bias, a judge's comments will provide a ground for habeas relief only if the comments deprived the petitioner of a fair trial.  Unlike an appellate court on direct appeal, a federal habeas court does not exercise supervisory powers over the state courts, *see Murphy v. Florida*, 421 U.S. 794, 797 (1975), and thus a federal court's habeas jurisdiction is limited to correcting violations of federal constitutional law; it does not have the authority to correct perceived injustices absent a constitutional violation.  *See Guinan v. United States*, 6 F.3d 468, 470-71 (7th Cir. 1993); 28 U.S.C. § 2254(a) (emphasis added) (federal court has jurisdiction to entertain petition brought by state prisoner "*only* on the ground that he is in custody

in violation of the Constitution or laws or treaties of the United States.").[5]

As the Sixth Circuit has explained:

Unless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction. In collateral proceedings, the test is whether the errors alleged could have rendered the trial fundamentally unfair. To violate a defendant's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree.

*McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985) (internal quotations, citations, and alterations omitted). Or as the Ninth Circuit has explained, on habeas review "the question is not simply whether the trial judge committed misconduct or whether [a federal appellate court] would reverse a conviction obtained after a trial in which a federal judge behaved in the same manner. Rather, we must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995); *accord Harrington v. Iowa*, 109 F.3d 1275, 1280 (8th Cir. 1997). In other words, to warrant habeas relief "there must be an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.'" *Duckett*, 67 F.3d at 740 (quoting *United States v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982)).

2.      *Analysis*

At trial, Catherine Zeni, petitioner's neighbor, testified on petitioner's behalf. Specifically, she testified that the police officers who questioned her were intimidating and threatening, and that she had inferred from what petitioner had told her that the victim was awake during the sexual act.

---

[5]In contrast, a federal court may use its supervisory powers over lower federal courts and federal prosecutors to correct injustices. *See United States v. Leslie*, 783 F.2d 541, 569-70 (5th Cir. 1986) (en banc) (Williams, J., dissenting), *vacated*, 479 U.S. 1074 (1987); *United States v. Crawford*, 466 F.2d 1155, 1157 (10th Cir. 1972).

*See* Trial Tr., dated 9/27/02, at 55-56.  After counsel finished their questioning of Ms. Zeni, the trial

judge questioned her regarding why she inferred that the victim was awake and why she felt

intimidated by the police.  As part of this questioning, the following exchange occurred:

| | |
|---|---|
| COURT: | Mrs. Zeni, were you told that or is that something you inferred because he was talking to her or because he said he was talking to her?  Is that something you inferred from what he told you or did he tell you that? |
| WITNESS: | He told me he was talking to her. |
| COURT: | So you inferred that she was awake? |
| WITNESS: | Correct. |
| COURT: | Okay.  But he never told you that? |
| WITNESS: | No. |
| COURT: | See that pretty lady on the end there?  You know her?  On the end. |
| WITNESS: | Uh-hmm. |
| COURT: | Who is she?  On the end. |
| WITNESS: | She's Detective Newsome. |

*Id*. at 56-57.  The trial judge then questioned the witness regarding her contacts with Detective

Newsome and other police officers.  Petitioner does not take issue with the substance of the trial

judge's questioning of Ms. Zeni.  Rather, petitioner contends that he was denied a fair trial by the

judge's reference to Detective Newsome as "that pretty lady."  He argues that "[i]n the context of

the judge's questions, applying a favorable adjective to his description of the investigating officer

showed partiality to the prosecution.  It suggested to the jury that he favored the detective over the

witness.  From the exchange, the jury could tend to give more credibility to the officer."  Br. in

Supp. of Pet., at 32-33.  The Michigan Court of Appeals rejected this claim, finding no merit to the

argument "that this reference to Officer Newsome's physical appearance improperly expressed a belief, one way or the other, concerning Officer Newsome's credibility as a witness." *Wiecek*, 2005 WL 292193, at *6, slip op. at 7. The Court should conclude that this determination was reasonable.

The Michigan Rules of Evidence provide that "[t]he court may interrogate witnesses, whether called by itself or by a party." MICH. R. EVID. 614(b). "The trial judge's duty is to conduct a trial in an orderly fashion and obtain truth and justice. He must see to it that the issue are not obscured and the testimony is not misunderstood. The trial court has the right to interrogate witnesses for this purpose." *United States v. Pierce*, 62 F.3d 818, 834 (6th Cir. 1995); *accord Glasser v. United States*, 315 U.S. 60, 82 (1942); *Riley v. Goodman*, 315 F.2d 232, 234 (3d Cir. 1963). "The judge, however, may not conduct such questioning in a way as to give the appearance of partiality to the jury, thereby prejudicing the defendant." *United States ex rel. Bradley v. Hartigan*, 612 F. Supp. 795, 810 (C.D. Ill. 1985), *aff'd sub nom. United States ex rel. Bradley v. Lane*, 834 F.2d 645, 648-49 (7th Cir. 1987). Here, contrary to petitioner's argument, the trial court's reference to Detective Newsome as "that pretty lady" did not give the appearance of partiality or otherwise deny petitioner a fair trial.

In context, the comment itself does not appear to be an actual opinion by the judge regarding the actual beauty, or lack thereof, of Detective Newsome. It appears, rather, to be nothing more than a courteous colloquialism, albeit one more common to an earlier generation. In any event, even if it was a genuine comment on Detective Newsome's appearance, and was taken that way by the jury, the statement did not demonstrate any bias or partiality by the judge toward the prosecutor, defense counsel, or petitioner. Nor did the statement regarding Detective Newsome's physical appearance bear in any way on the credibility of her or Ms. Zeni. Thus, the comments did not deprive petitioner

33

of a fair trial.  In addition, the judge's questions were brief in the context of the entire trial.  Habeas relief generally is not appropriate based on a few improper comments during the course of a long trial.  *See United States v. Saenz*, 134 F.3d 697, 702 (5th Cir. 1998); *Harrington*, 109 F.3d at 1280; *cf*. *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir. 1994) (trial not rendered fundamentally unfair by trial judge's comments unless the judge's intervention was "quantitatively and qualitatively substantial.").  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Sufficiency of the Evidence (Claim V)*

Petitioner next contends that insufficient evidence was presented to prove his guilt of CSC-I beyond a reasonable doubt.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence.

34

*See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Petitioner was convicted of first degree criminal sexual conduct based on a helpless victim. The statute under which petitioner was convicted provides:

> A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:
> . . . .
> The actor causes personal injury to the victim, and the actor knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless.

MICH. COMP. LAWS § 750.520b(1)(g).  By its terms, the statute establishes four elements that the prosecution must prove beyond a reasonable doubt.  Specifically, under § 750.520b(1)(g), " a person is criminally liable if [1] he has sexual penetration with another person [2] without that person's

consent, [3] causes personal injury to that person, and [4] knows or has reason to know that the victim is mentally incapable, . . . or mentally incapacitated[, or physically helpless.]" *Regan v. Hoffner*, 209 F. Supp. 2d 703, 713 n.6 (E.D. Mich. 2002) (Friedman, J.).   Under the statute, "'[p]hysically helpless' means that a person is unconscious, asleep, or for any other reason is physically unable to communicate unwillingness to an act."  MICH. COMP. LAWS § 750.520a(m). "Whether a defendant knows or has reason to know that the victim is physically helpless is determined by an objective reasonable person standard." *Wiecek*, 2005 WL 292193, at *7, slip op. at 8 (citing *People v. Baker*, 157 Mich. App. 613, 615, 403 N.W.2d 479, 480-81 (1986)).

2.    *Analysis*

Petitioner contends that there was insufficient evidence to show that the victim was physically helpless or that he knew that the victim was physically helpless.  He argues that the victim's testimony was that she had gotten drunk, and taken off her clothes in the hot tub and exposed her gentalia to the hot tub jet, and that the next thing she remembered was waking up clothed in petitioner's bed.  *See* Pet'r's Br., at 34.  He argues, therefore, that "[a]ll the government had was a gap in the complainant's memory." *Id*.  However, because this testimony was consistent with his defense that the victim consented to sex but did not remember it because she was in an alcoholic blackout, and because there was testimony that a person in an alcoholic blackout could appear to function normally but have no recall of her actions, petitioner would have had no reason to think that the victim was physically helpless.  *See id*.  The Michigan Court of Appeals rejected petitioner's claim, reasoning that "[a]part from any GHB ingestion, there was evidence that the victim become unconscious after drinking rum, beer, and wine.  The victim testified that she had no memory of the sexual encounter and blacked out for an approximate three-hour period.  When she

36

awoke, defendant told her that he had lost his virginity.  Viewed most favorably to the prosecution, the evidence was sufficient to establish that defendant sexually penetrated the victim while she was 'physically helpless.'" *Wiecek*, 2005 WL 292193, at *7, slip op. at 8.  Petitioner contends that the court of appeals "ignored" the "lack of evidence in support of the verdict" by "mistakenly consider[ing] the complainant's amnesia synonymous with unconsciousness.  That construction of the evidence was patently unreasonable."  Br. in Supp. of Pet., at 34.  The Court should disagree, and conclude that the Michigan Court of Appeals's determination was reasonable.

At the outset, petitioner's argument is at least in part premised on a view of the statute which required the prosecution to show that the victim was unconscious.  This is not so.  The statute by its own terms defines "physically helpless" as including unconsciousness, but also as including any other reason which renders the victim physically unable to communicate unwillingness.  *See* MICH. COMP. LAWS § 750.520a(m).  And there was sufficient evidence presented to the jury, when viewed in the light most favorable to the prosecution, to show that the victim was unconscious or otherwise physically unable to communicate her unwillingness to participate in the sexual act.  First, the victim's own testimony established that she blacked-out for a period of three hours, which itself provides evidence–again when viewed in the light most favorable to the prosecution–that she was unconscious.  It is true that her black-out could also be consistent with an alcoholic blackout in which she appeared to be functioning normally, but the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient, *see Jackson*, 443 U.S. at 326, and the jury was free to reject the testimony of petitioner's expert.  Further, at one point during cross-examination petitioner's expert testified that the victim may have been unconscious due to the combination of alcohol ingestion, the rate at which it was ingested, and the victim sitting in the hot

37

tub.  *See* Trial Tr., dated 9/26/02, at 53.  The victim testified that she had bruises on her legs and

upper arms, *see id.*, dated 9/18/02, at 187, providing some evidence that petitioner had to physically

move the victim on his own because she was incapable of doing so.  Finally, the victim testified that

petitioner called her later that evening and told her that they were both "very drunk," that she was

so drunk she had lost control of her bowel in the hot tub, and that he had carried her "fireman style"

to the shower, showered her, and dressed her.  *See id.*, dated 9/19/02, at 5-7.

Thus, viewed in the light most favorable to the prosecution, there was evidence that the

victim passed out for three hours, that she was "very drunk" and that petitioner knew this to be so,

and that she was so incapacitated (regardless of whether she was actually unconscious) that she

could not walk to the shower and shower herself, dress herself, or control her bowel and that

petitioner knew this to be so.  Thus, there was abundant evidence from which the jury could have

concluded beyond a reasonable doubt that petitioner knew or should have known that the victim was

unconscious or otherwise physically unable to communicate her unwillingness to consent to sexual

activity.  *See People v. Cain*, No. 219563, 2000 WL 33402999, at *3 (Mich. Ct. App. Nov. 3, 2000)

(evidence sufficient to establish physical helplessness where victim testified that she was going in

and out of consciousness due to intoxication); *People v. Piatkowski*, No. 213414, 2000 WL

33417524, at *1 (Mich. Ct. App. June 23, 2000) (evidence sufficient to establish physical

helplessness where there was evidence that victim was impaired by alcohol and other drugs and

defendant with a friend had to help the victim into the bedroom because she was too impaired to

walk); *People v. Conner*, No. 196251, 1997 WL 33350514, at *1 (Mich. Ct. App. May 30, 1997)

(evidence sufficient to establish physical helplessness where there was evidence that victim

consumed alcohol and Valium, passed out, and had to be carried by defendant and another man);

*cf. Tessin v. Elo*, No. 97-1882, 1999 WL 68558, at *8 (6th Cir. Jan. 19, 1999) (evidence of incapacitation sufficient based on "both the victim's testimony that the alcohol caused him to become so intoxicated that he could not move or stop the petitioner and also the testimony of both the government's and the petitioner's medical experts, which established that consumption of alcohol by a naive drinker would cause intense intoxication.").[6]   Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Right to Counsel and Ineffective Assistance of Counsel (Claims III & VI)*

Petitioner next contends that he was denied his Sixth Amendment rights to counsel and to

---

[6]Although not binding, cases from other jurisdictions with sexual assault statutes similar to Michigan's statutes provide further support of the reasonableness of the court of appeals's decision. For instance, Arkansas, New York, and Wyoming have statutes which define "physically helpless" similar to the Michigan definition. *See* ARK. CODE ANN. § 5-14-101(6) ("'Physically helpless' means that a person is: (A) unconscious; (B) physically unable to communicate a lack of consent; or (C) rendered unaware that a sexual act is occurring."); N.Y. PENAL LAW § 130.00[7] (physical helplessness means that "a person is unconscious or for any other reason is physically unable to communicate unwillingness to act."); WYO. STAT. ANN. § 6-2-301 ("'Physically helpless' means unconscious, asleep or otherwise physically unable to communicate unwillingness to act."). Courts in each of these states have found sufficient evidence of physical helplessness in circumstances similar to those present here. *See, e.g., Oliver v. State*, No. CACR 06-897, 2007 WL 757540, at *1 (Ark. Ct. App. Mar. 14, 2007) (evidence sufficient based on victim's testimony that she took a medication which made her drowsy, went to bed, and did not remember anything until she woke up in the morning, notwithstanding the defendant's testimony that the victim forced herself upon him); *Marshall v. State*, 223 S.W.3d 74, 79 (Ark. Ct. App. 2006) (evidence sufficient notwithstanding testimony of some witnesses that the victim was responsive, where other evidence showed that the victim had consumed a large quantity of alcohol and was "at times unconscious, inebriated, 'out of it,' unable to stand, unable to walk, and unable to sit on the couch without falling off."); *People v. Fuller*, 854 N.Y.S.2d 594, 598 (App. Div. 2008) (evidence sufficient where victim testified that she was "very drunk" and had "passed out."); *People v. Perkins*, 810 N.Y.S.2d 596, 598 (App. Div. 2006) (evidence sufficient where victim testified that she blacked out and "was so drunk she didn't know what was going on."); *CSC v. State*, 118 P.3d 970, 974 (Wyo. 2005) (sufficient factual basis established for plea to aiding and abetting sexual assault of physically helpless victim where evidence showed that defendant witnessed the victim participating in a beer chugging contest, saw her stumble into the bedroom, and was told that she was intoxicated). Indeed, these statutory provisions and the cases applying them reflect the long-standing common law rule. *See Commonwealth v. Burke*, 105 Mass. 376, 380-81 (1870) (lack of consent element of rape established where evidence showed that the victim was "so drunk as to be utterly senseless" and "wholly insensible so as to be incapable of consenting.").

the effective assistance of counsel.  The court should conclude that petitioner is not entitled to habeas relief on these claims.

      1.    *Denial of Right to Counsel (Claim III)*

     Petitioner contends that he was denied his Sixth Amendment right to counsel when the trial judge prohibited his counsel from lodging any objections to the prosecutor's rebuttal argument. During that argument, defense counsel objected to a statement made by the prosecutor.  The trial judge responded: "Mr. Callahan, there is a century honored, centuries honored rule among trial lawyers not to interfere with another lawyer's argument, no matter what the provocation.  Unwritten rule.  An unwritten rule among trial lawyers for centuries." Trial Tr., dated 9/27/02, at 129.  Counsel lodged no further objections during the rebuttal argument.  Petitioner contends that this amounted to a complete denial of counsel, and that he therefore need not establish prejudice to be entitled to relief on this claim.  He therefore contends that the Michigan Court of Appeal's conclusion that petitioner was not entitled to relief on this claim because he was not prejudiced was unreasonable. The Court should disagree.

     The Supreme Court has limited the presumed prejudice standard to three types of ineffective assistance claims: (1) complete denial of counsel; (2) government interference with the right to counsel; and (3) conflicts of interest.  *See Smith v. Robbins*, 528 U.S. 259, 287 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 692 (1984); *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984)).  The Supreme Court has stated that the first category–complete denial of counsel–encompasses both actual and constructive denials of counsel.  Thus, a complete denial of counsel can be found where there is simply no lawyer present at a critical stage of the proceedings, *see Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000), or where the defendant is constructively denied

counsel because "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659, or where "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *id*. at 659-60.

Petitioner has cited, and I have found, no cases suggesting that a limitation on counsel's ability to object during the prosecutor's closing argument amounts to a complete denial of counsel. Nor does petitioner's claim fall into any of the categories of denial of counsel recognized by the Supreme Court. Here, there is no question that counsel was present during the entirety of the prosecutor's rebuttal argument, and thus petitioner was not actually denied the presence of counsel. Likewise, petitioner was not constructively denied the right to counsel by counsel's failure to subject the prosecution's case to meaningful adversarial testing. Counsel was able to conduct a complete defense of petitioner, with the limited exception of not being able to object to the prosecutor's rebuttal argument. As the Supreme Court has recently explained, for an ineffective assistance claim to come within this limited exception to *Strickland*, "the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002). The distinction is between "bad lawyering" and "no lawyering," *Woodard v. Collins*, 898 F.2d 1027, 1028 (5th Cir. 1990); *see also*, *Moss v. Hofbauer*, 286 F.3d 851, 861 (6th Cir. 2002), and the difference is not one of degree, but one of kind, *see Bell*, 535 U.S. at 697. Here, petitioner's claim is essentially a run-of-the-mill claim that counsel failed to object to prosecutorial misconduct during the prosecutor's rebuttal argument. In light of counsel's otherwise vigorous defense of petitioner, this does not amount to "no lawyering."

It is true that counsel's failure to object to the prosecutor's rebuttal argument may have been

the result of the trial judge's response to his first objection, rather than due to any fault of counsel. This distinction, however, is irrelevant. As the Court explained in *Cronic*: "The fact that the accused can attribute a deficiency in his representation to a source external to trial counsel does not make it any more or less likely that he received the type of trial envisioned by the Sixth Amendment, nor does it justify reversal of his conviction absent an actual effect on the trial process or the likelihood of such an effect." *Cronic*, 466 U.S. at 662 n.31. Thus, the burden of establishing prejudice "remains the same regardless of whether the alleged deficiency is counsel's own fault or arises due to 'external constraints.'" *Lenz v. Washington*, 444 F.3d 295, 303 (4th Cir. 2006).

Nor is this a case where although counsel was available to assist petitioner, the circumstances were such that a fully competent lawyer could not provide effective assistance. As explained above, the alleged denial of counsel occurred for only a minimal portion of petitioner's multi-day trial, at a time which did not involve the receipt of any evidence. Further, counsel was not wholly without remedy if he thought that the prosecutor had said something objectionable during the rebuttal argument. The trial judge's admonition instructed counsel not to interrupt the prosecutor's argument; however, nothing in the admonition precluded counsel from objecting after the prosecutor had completed her argument and seeking appropriate relief, such as a mistrial or a limiting instruction.

Further, even if petitioner were constructively denied counsel during the prosecutor's rebuttal argument, relief would not be appropriate without a finding that the denial of counsel affected the verdict. In *Satterwhite v. Texas*, 486 U.S. 249 (1988), the Court explained that *Cronic* and the other cases requiring automatic reversal based on a denial of counsel were all "cases in which the deprivation of the right to counsel affected–and contaminated–the entire criminal proceeding." *Id.*

at 257.  Thus, for example, the Court has "permitted harmless error analysis in both capital and

noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous

admission of particular evidence at trial."  *Id.*; *see also*, *Penson v. Ohio*, 488 U.S. 75, 88 (1988)

(characterizing *Satterwhite* as stating "that a *pervasive* denial of counsel casts such doubt on the

fairness of the trial process, that it can never be considered harmless error.") (emphasis added).  As

the First Circuit has explained:

> The Supreme Court recently has emphasized how seldom circumstances arise
> that justify a court in presuming prejudice (and, concomitantly, in forgoing
> particularized inquiry into whether a denial of counsel undermined the reliability of
> a judgment). *See Mickens v. Taylor*, 535 U.S. 162 (2002); *Bell v. Cone*, 535 U.S. 685
> (2002). . . . The only Sixth Amendment violations that fit within this narrowly
> circumscribed class are those that are pervasive in nature, permeating the entire
> proceeding. *See Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000) (collecting cases).
> In other words, the doctrine of per se prejudice applies to "a wholesale denial of
> counsel," whereas conventional harmless error analysis applies to a "short-term,
> localized denial of counsel." *Curtis v. Duval*, 124 F.3d 1, 5-6 (1st Cir.1997).

*Ellis v. United States*, 313 F.3d 636, 643 (1st Cir. 2002) (parallel citations omitted); *see also*, *United*

*States v. Walters*, 309 F.3d 589, 593 (9th Cir. 2002) (internal quotation omitted) (applying harmless

error to denial of counsel where denial "did not affect the conduct of the trial from beginning to

end.").

"Indeed, every federal circuit court of appeals has stated, post-*Cronic*, that an absence of

counsel at a critical stage may, under some circumstances, be reviewed for harmless error."  *People*

*v. Murphy*, 481 Mich. 919, 923, 750 N.W.2d 582, 586 (2008) (Markman, J., concurring) (citing

cases).  This includes the Sixth Circuit.  *See Mitzel v. Tate*, 267 F.3d 524, 534 (6th Cir. 2001).  In

this case, "petitioner does not posit that he lacked the effective assistance of counsel throughout the

proceedings but only at a specific point in the trial . . . .  This is a difference 'not of degree but of

kind' in terms of whether the court's error can be deemed *per se* prejudicial."  *Ellis*, 313 F.3d at 643

43

(quoting *Bell*, 535 U.S. at 697). The "evil caused by [the] Sixth Amendment violation" in this case–the presentation of a couple of allegedly improper prosecutorial statements to the jury during rebuttal argument–is akin to a Sixth Amendment violation resulting in the erroneous admission of evidence at trial, for which harmless error review is appropriate, *Satterwhite*, 486 U.S. at 257; *Mitzel*, 267 F.3d at 534, and this is not a case in which "the deprivation, by its very nature, cannot be harmless." *Rushen v. Spain*, 464 U.S. 114, 117 n.2 (1983) (subjecting to harmless error review claim that defendant was denied his right to be present and his right to counsel when neither he nor counsel were party to conversation between judge and juror). Thus, even if the trial court's admonition to counsel that he should not interrupt the prosecutor's rebuttal argument caused a constructive denial of counsel, the Court should conclude "that prejudice cannot be presumed on the basis of the momentary lapse that occurred in this case." *Ellis*, 313 F.3d at 643-44.

Further, after applying this rule, the Court should conclude that the trial court's preclusion of objections to the prosecutor's rebuttal argument was harmless. As explained above, each of the prosecutorial comments about which petitioner complains were either proper or not prejudicial. Thus, the alleged denial of counsel did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Accordingly, the Court should conclude that petitioner is note entitled to habeas relief on this claim.

2.   *Ineffective Assistance of Counsel (Claim VI)*

Petitioner also claims that he was denied the effective assistance of counsel because counsel failed to seek admission of the victim's journal under Rules 406 and 404(b) and for impeachment purposes, and because counsel failed to object to prosecutorial misconduct. The Court should

44

conclude that petitioner is not entitled to habeas relief on these claims.

### a. Clearly Established Law

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

45

*b. Analysis*

Petitioner contends that counsel was ineffective for failing to seek admission of the victim's poem under Rules 404(b) (evidence of other crimes, wrongs, or acts) and 406 (evidence of habit), and for failing to seek to use the poem for purposes of impeachment as a prior inconsistent statement. Because petitioner cannot show a reasonable probability that the evidence would have been admitted had counsel sought admission on these bases, he cannot demonstrate that he was prejudiced by counsel's performance.

The rape shield law, but its nature, excludes evidence that would otherwise be admissible in the absence of the statute. Thus, once it was determined by the trial court that the poem was within the ambit of the statute, the evidence was simply inadmissible regardless of whether some other rule of evidence would have permitted its introduction. *See People v. Ivers*, 459 Mich. 320, 328, 587 N.W.2d 10, 14 (1998) ("The rape shield statute acts as a bar to testimony regarding sexual subjects involving the complainant, unless such testimony falls outside the scope of the statute."). Thus, the Michigan Court of Appeals concluded that the evidence was not admissible for any of these purposes as a matter of state law. *See Wiecek*, 2005 WL 292193, at *8-*9, slip op. at 9. In analyzing petitioner's ineffective assistance of counsel claim, this expression of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). Thus, any objection by counsel would have been futile. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d

46

922, 929 (5th Cir. 1993). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner also contends that counsel was ineffective for failing to object to the various instances of prosecutorial misconduct identified in his petition. However, each of the statements about which petitioner complains were either proper or did not deprive him of a fair trial. Thus, petitioner cannot show that he was prejudiced by counsel's failure to object to these comments. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his ineffective assistance of counsel claims.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit*

*Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 1/14/09


The undersigned certifies that a copy of the foregoing order was served on the attorneys of record  by electronic means or U.S. Mail on January 14, 2009.

s/Eddrey Butts
Case Manager